2006-NMSC-039
STATE OF NEW MEXICO, Plaintiff-Respondent,
v.
DEL E. ROMERO, Defendant-Petitioner.
STATE OF NEW MEXICO, Plaintiff-Respondent,
v.
MATTHEW GUTIERREZ, Defendant-Petitioner.
Docket No. 28,410, Consolidated with Docket No. 28,688.
Supreme Court of New Mexico.
Filing Date: June 14, 2006.
Revised September 12, 2006.
John Bigelow, Chief Public Defender, Laurel A. Knowles, Assistant Appellate Defender, Santa Fe, NM, Pueblo of Pojoaque Legal Department, Frank A. Demolli, Santa Fe, NM, for Petitioners.
Patricia A. Madrid, Attorney General, Margaret McLean, Assistant Attorney General, Santa Fe, NM, for Respondent.
Rothstein, Donatelli, Hughes, Dahlstrom & Bienvenu, L.L.P., Richard W. Hughes, Caren I. Friedman, Santa Fe, NM for Amicus Curiae, Pueblo of Santa Clara.
Nordhaus, Haltom, Taylor, Taradash & Bladh, L.L.P., Jill E. Grant, Stephen H. Greetham, Albuquerque, NM for Amici Curiae, Pueblos of Laguna San Juan, Santa Ana and Taos Chestnut Law Offices.
Peter C. Chestnut, Ann Berkley Rodgers, Albuquerque, NM, for Amicus Curiae Pueblo of Acoma Pueblo of Tesuque Legal Department.
Mekko Miller, Santa Fe, NM, for Amicus Curiae, Pueblo of Tesuque Roth, VanAmberg, Rogers, Ortiz, Fairbanks & Yepa, L.L.P,
David R. Yepa, Albuquerque, NM, for Amici Curiae Pueblos of Cochiti and Jemez, Sonosky, Chambers, Sachse, Endreson & Mielke, L.L.P.
David C. Mielke, Albuquerque, NM, for Amici Curiae Pueblos of Isleta, Sandia and Zia Pueblo of Pojoaque Legal Department.
Frank Demolli, Jana C. Werner, Santa Fe, NM for Amicus Curiae Pueblo of Pojoaque, White, Koch, Kelly & McCarthy, P.A.
Albert V. Gonzales, Santa Fe, NM, for Amicus Curiae Pueblo of Zuni.
Kenneth H. Bobroff, Albuquerque, NM for Amici Curiae American Indian Law Center, Inc., and UNM Native American Law Students Association.

OPINION
SERNA, Justice.
{1} The State of New Mexico charged Defendant Romero for alleged crimes on privately-owned land within the exterior boundaries of Taos Pueblo and Defendant Gutierrez for alleged crimes on privately-owned fee land within the exterior boundaries of Pojoaque Pueblo. Both Defendants challenged the indictments due to the State's lack of jurisdiction to prosecute Indians in Indian country and petitioned this Court to determine whether the State has jurisdiction.[1] We conclude that the State does not have jurisdiction to prosecute Defendants for alleged crimes occurring within the exterior boundaries of the pueblos; therefore, we affirm the district courts and reverse the Court of Appeals.

I. FACTS AND PROCEDURAL POSTURE
{2} Defendant Del E. Romero is an enrolled member of Taos Pueblo. On June 19, 2001, a State of New Mexico Grand Jury indicted Defendant Romero for alleged aggravated battery against another enrolled member of Taos Pueblo. Defendant Romero moved to dismiss the indictment on August 13, 2001, due to the State's lack of jurisdiction because the State indicted him for alleged acts within the exterior boundaries of Taos Pueblo. The State contested this assertion and argued that the alleged acts occurred at privately-owned Pueblo Alegre Mall within the boundaries of Taos Town, and outside the exterior boundaries of Taos Pueblo. The parties eventually agreed that the incident occurred on private property within Taos Town and within the exterior boundaries of the Taos Pueblo Land Grant. The district court concluded that the State did not have jurisdiction and dismissed the indictment on December 7, 2001. The State appealed.
{3} Defendant Matthew A. Gutierrez is an enrolled member of Pojoaque Pueblo. On August 25, 2002, Pojoaque Pueblo Tribal Police arrested Defendant Gutierrez after a stabbing incident. Defendant Gutierrez was arraigned in Pojoaque Tribal Court on August 29, 2002, for assault, battery, carrying a concealed weapon, criminal negligence, and disorderly conduct in violation of Pojoaque Pueblo Tribal Law and Order Code. He did not contest the tribal court's jurisdiction. The Pojoaque Pueblo Tribal Police Department contacted the Bureau of Indian Affairs, which commenced an investigation and referred the matter to the United States Attorney for the District of New Mexico for prosecution. After the commencement of the tribal prosecution, the State of New Mexico indicted Defendant Gutierrez on September 13, 2002, for the same incident. The State charged aggravated battery with a deadly weapon, child abuse, and battery against a household member. The alleged victims are non-Indians. Pojoaque Pueblo Chief Judge Edie Quintana entered a Memorandum Opinion and Declaratory Judgment on October 7, 2002, declaring that the tribal court had jurisdiction. Defendant moved to dismiss the State indictment on January 27, 2003, due to the State's lack of jurisdiction. The State and Defendant Gutierrez disputed whether the alleged crimes occurred in Indian country. The parties agree that the alleged crime occurred within the exterior boundaries of the Pojoaque Pueblo on non-Indian fee land owned by Defendant Gutierrez's father-in-law, Ben Garcia. The district court dismissed the case due to the State's lack of jurisdiction. The State appealed. The Court of Appeals reversed the district courts in both cases in split decisions. State v. Romero, 2004-NMCA-012, 135 N.M. 53, 84 P.2d 670; State v. Gutierrez, No. 24,731 (Ct. App. May 20, 2004).
{4} In addition to the contemporary facts specific to the pending cases, historical facts are also relevant to resolving the jurisdictional dispute. Taos Pueblo was settled in approximately 1000 A.D. Ruben Salaz Marquez, New Mexico: A Brief Multi-History 4 (1999). Our government has previously recognized that Pojoaque Pueblo has been inhabited since approximately 850-1100 A.D. See Department of the Interior, National Park Service, Notice of Inventory Completion for Native American Human Remains and Associated Funerary Objects from New Mexico in the Possession of the Museum of Indian Arts and Culture/Laboratory of Anthropology, Museum of New Mexico, Santa Fe, N.M., 63 Fed. Reg. 35,608 (June 30, 1998). In 1540, the pueblo people encountered their first European, Francisco Vasquez de Coronado. Salaz Maquez, supra, at 14. In 1598, Juan de Onate claimed for Spain land that is now New Mexico and met with the pueblo people to explain his colonizing efforts. Id. at 19, 23. Between 1684 and 1691, Governor Jironza Cruzate made land grants on behalf of Spain of approximately 17,000 acres to each pueblo, id. at 69-70, which started the chain of title that is recognized by this state's modern-day property law system. In 1821, the land over which this Court is now supreme changed hands from Spain to Mexico. Id. at 170. In 1850, New Mexico became a United States territory. Id. at 243. Congress then confirmed Taos and Pojoaque Pueblos' land grants. Act of December 22, 1858, 35th Cong., 11 Stat. 374 (1859). Prior to statehood, the United States Congress passed New Mexico's Enabling Act, which confirmed the grants made to the Territory of New Mexico. H. Res. 18166, 61st Cong., 36 Stat. 557 (1910). In 1912, New Mexico became a state. Salaz Marquez, supra, at 424. Then, in 1924, the Pueblo Lands Act recognized this history. In 1948, Congress passed an Indian country criminal jurisdiction statute, 18 U.S.C. § 1151 (1948). In 1998, the United States Supreme Court decided Alaska v. Native Village of Venetie Tribal Government, 522 U.S. 520 (1998) and came down with the set aside and superintendence standard.
{5} Consistent with this history, the district judge in Defendant Romero's case regarding Taos Pueblo decided that the land in question was clearly within the exterior boundaries of the pueblo grant. In Defendant Gutierrez's case within Pojoaque Pueblo, the district judge found as a fact that, "[t]he site of the alleged crime has been `Indian country' for hundreds of years and has been acknowledged as such by the federal government."

II. STANDARD OF REVIEW
{6} Statutory construction is a question of law that is reviewed de novo. State v. Rowell, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995). This Court defers to a district court's fact determinations if such findings are supported by substantial evidence. State v. Frank, 2002-NMSC-026, P10, 132 N.M. 544, 52 P.3d 404. In this case, we defer to the district courts' findings of facts because they are supported by substantial evidence.

III. ANALYSIS

A. Indian Country
{7} We are called upon to determine whether the State has jurisdiction to prosecute alleged crimes committed by Defendant Indians on private fee land within the exterior boundaries of Defendants' respective pueblos. If the land in question is Indian country, the State prosecution must be dismissed. Resolving this requires an interpretation of federal law because Congress has codified in 18 U.S.C. § 1151 what lands are "Indian country" for purposes of criminal prosecution. Even though our state judiciary has confronted this issue before, we base our decision in these cases on federal law because the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby. . . ." U.S. Const. art. VI, cl. 2. The criminal jurisdiction statute, 18 U.S.C. § 1151, states:
Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country," as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
{8} The federal statutes we apply demand the outcome that jurisdiction not rest with the State. We note, however, that any ambiguity in § 1151 or the Pueblo Lands Act, S. 2932, 68th Cong., 43 Stat. 636 (1924), is to be resolved in favor of the Defendant Indians. The canons of construction favor the Indians: "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985).
{9} Defendant Romero argues that Taos Pueblo is Indian country within § 1151 for two reasons: "(a) all land within the limits of any Indian reservation" applies because a pueblo is a reservation, and "(b) all dependent Indian communities" applies because pueblos are dependent Indian communities. The State counters that Taos Pueblo is neither a reservation nor a dependent Indian community. It is not in dispute for this Defendant that subsection (c) does not apply. Defendant Gutierrez argues that Pojoaque Pueblo is Indian country for one reason: "(b) all dependent Indian communities" applies because pueblos are dependent Indian communities. The State again counters that Pojoaque Pueblo is not a dependent Indian community. Subsections (a) and (c) are not in dispute for this Defendant.
{10} We determine that a pueblo is a dependent Indian community within the meaning of § 1151(b). Nearly one hundred years ago, long before Congress codified the term dependent Indian community in § 1151, the United States Supreme Court decided United States v. Sandoval, 231 U.S. 28 (1913), which addressed whether the Pueblo Indians are the same as other Indians for the purpose of prohibiting liquor sales. The case established that pueblos are regarded as dependent Indian communities:
As before indicated, by an uniform course of action beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the Government have regarded and treated the Pueblos of New Mexico as dependent communities entitled to its aid and protection, like other Indian tribes . . . this assertion of guardianship over them cannot be said to be arbitrary but must be regarded as both authorized and controlling.
Id. at 47. The 1913 opinion which, in part, gave rise to § 1151(b), does aid our statutory construction because it treats a pueblo as a dependent Indian community. 18 U.S.C. § 1151, Historical and Statutory Notes (basing definition on latest construction of the term by United States Supreme Court).
{11} The United States Supreme Court also more recently delineated the term dependent Indian community for the purpose of construing § 1151(b) in Venetie, 522 U.S. 520. We adopted the Venetie analysis in Frank. In Venetie, the Court determined whether the land in question was Indian country for the purposes of adjudicating a tax liability dispute. To determine if the land was Indian country, the Court construed the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 (1971), which has no bearing on the land ownership system for New Mexico pueblos. See Frank, 2002-NMSC-026, 28-29 (Minzner, J., dissenting). With the specific Alaskan facts in mind, the Court employed a two-prong test to determine the existence of a dependent Indian community.
We now hold that [dependent Indian community] refers to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements  first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence. Our holding is based on our conclusion that in enacting § 1151, Congress codified these two requirements, which previously we had held necessary for a finding of "Indian country" generally.
Venetie, 522 U.S. at 527.
{12} As a preliminary issue, we reckon with the phrase "a limited category of Indian lands that are neither reservations nor allotments." Prior to Venetie, it was commonly understood that the three categories of § 1151 were overlapping. "It is apparent that Indian reservations and dependent Indian communities are not two distinct definitions of place but rather definitions which largely overlap." Felix S. Cohen, Handbook of Federal Indian Law 38 (1982 ed.). However, Justice Thomas seemed to indicate that a particular piece of Indian country could not be both a reservation as described in § 1151(a) and a dependent Indian community as described in § 1151(b). This may be perfectly apt when construing the Alaska Native Claims Settlement Act as in Venetie, but the Court likely was not considering the unique circumstances of New Mexico's pueblos. For the purposes of resolving the cases before us in which Defendant Romero from Taos Pueblo argues that both §§ 1151(a) and (b) apply and Defendant Gutierrez from Pojoaque Pueblo argues only that § 1151(b) applies, we base our decision that pueblos are Indian country on dependent Indian community status within the meaning of § 1151(b) as determined by Justice Thomas' two-prong test in Venetie.[2] In applying Venetie's analytical framework to New Mexico's pueblos, we produce a jurisdictional result that restates what we understood the law to be even prior to Venetie.
{13} We hold that the lands in question satisfy Venetie's first prong regarding the federal set aside requirement. Defendants and the State do not agree on which land is to be considered under Venetie's two prongs. The State asks us to consider the specific parcels of private fee land within the exterior boundaries of Taos and Pojoaque Pueblos that are the locations of the alleged crimes and argues that the parcels of private fee land have not met the requirements of federal set aside, so the land in question is not Indian country within § 1151(b). Defendants urge us to review all land within the pueblos' exterior boundaries considered as a whole and assert that these lands have met Venetie's federal set aside standard, so the land in question is Indian country within § 1151(b). In order for this Court to determine if the land in question meets the federal set aside prong, we are guided by the fact that even the now privately-held parcels have been previously recognized as set aside by the federal government for the use of the Indians as Indian land, as discussed in the facts section. Both the United States Supreme Court and our state courts have previously resolved this issue in favor of Indian defendants. Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351 (1962); State v. Ortiz, 105 N.M. 308, 731 P.2d 1352 (Ct. App. 1986).
{14} A brief note on potentially conflicting precedent is merited. The State cites Frank, 2002-NMSC-026, for the proposition that we have previously adopted Venetie's two-prong analysis. The State's answer briefs do not raise the following issue from Frank, but we do in order to dispose of it: "In light of the clear guidelines in the Venetie opinion, we decline to incorporate a community of reference inquiry into our case law." Id. P22. This case is distinguishable from Frank, which involved highway land owned by the federal government, and thus presented a different jurisdictional dispute regarding an initial determination of whether the land in question was Indian country. The initial determination of whether the land in question is Indian country is easier in the present cases because, independent of the community of reference analysis, statutes and cases provide guidance. Congress and the United States Supreme Court have established that pueblo lands are Indian country. See the Enabling Act, H. Res. 18166, 61st Cong., 36 Stat. 558 (1910) ("the introduction of liquors into Indian country, which term shall also include all lands now owned or occupied by the Pueblo Indians of New Mexico . . ."), and Venetie's statement, based on Sandoval, that pueblos may be Indian country, 522 U.S. at 528, 530. Since we also conclude that pueblos satisfy the federal set aside and federal superintendence tests for Indian country set out in Venetie, pueblos qualify as Indian country.
{15} In sum, we hold that Venetie's set aside requirement is satisfied by congressional acts recognizing pueblo land, and in this case also by the district judges' fact findings, even though new law, such as § 1151 enacted in 1948, is rarely a perfect fit for a land ownership system that started hundreds of years ago by prior sovereign nations. To hold otherwise would suggest ignorance of established historical record regarding governmental protection from the time of the Spanish conquistadores through the Pueblo Lands Act of 1924.
{16} We also hold that the lands in question are under federal superintendence as required by Venetie's second prong. The Venetie Court wrote, "the federal superintendence requirement guarantees that the Indian community is sufficiently `dependent' on the Federal Government that the Federal Government and the Indians involved, rather than the States, are to exercise primary jurisdiction over the land in question." 522 U.S. at 531. The State relies on the statement, "[I]t is the land in question, and not merely the Indian tribe inhabiting it, that must be under the superintendence of the Federal Government." Id. at 531 n.5 (emphasis omitted). The State argues that we should look only to the parcels of private fee land, rather than the whole pueblo, but the State does not cite any authority for this narrow interpretation. We do not think it makes sense to apply the test only to the parcels of private fee land when the sites of the alleged crimes are encompassed by the exterior boundaries of the pueblos. Instead, we look to the pueblo as a whole and determine if the pueblo is under federal government superintendence. Considering the pueblo as a whole is also consistent with congressional intent in enacting § 1151 because it discourages checkerboarding. Hilderbrand v. Taylor, 327 F.2d 205, 207 (10th Cir. 1964) ("Such an impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151 and we see no justification for adopting an unwarranted construction of that language where the result would be merely to recreate confusion Congress specifically sought to avoid." (quoting Seymour, 368 U.S. at 358)); Cohen, supra, at 39 (noting that "full statute was intended to reduce earlier difficulties which had arisen from the `checkerboarding' of land ownership and rights-of-way").
{17} Defendant Gutierrez established an evidentiary trial record that Pojoaque Pueblo is under federal superintendence, which led the trial judge to find, "[t]he federal government has had the responsibility for the superintendence of all lands within the Pueblo of Pojoaque since the United States confirmed Spanish and Mexican grants in 1864." Further, "[f]or 150 years, the United States, primarily through the Bureau of Indian Affairs, has governed all aspects of tribal life." The trial court continued, "[t]he federal government today superintends any conduct by an Indian on all land within the reservation, including non-Indian or private claim land." The court further found, "[t]he federal government has historically superintended all land, whether pueblo-owned or private claim, that is located within the exterior boundaries of the Pueblo of Pojoaque." We accept the trial judge's fact findings because they are based on substantial evidence, and we therefore conclude that Defendant Gutierrez and Pojoaque Pueblo satisfy Venetie's federal superintendence prong. Even though Defendant Romero argued § 1151(a) and § 1151(b) on appeal, he did not argue § 1151(b) at the trial court level, so he did not develop federal superintendence evidence for Taos Pueblo. While we could remand the Romero case for an evidentiary hearing regarding § 1151(b) and Venetie's federal superintendence prong, we return to the overriding considerations: Defendant Romero satisfied Venetie's federal set aside prong for Taos Pueblo, the parties agree that the incident occurred within Taos Pueblo's exterior boundaries, in considering federal superintendence we look at the pueblo as a whole, and we have no reason to question that Taos Pueblo is different than Pojoaque Pueblo in regard to federal superintendence. Both state and federal courts have recognized federal superintendence over pueblo lands. This question has been resolved so consistently that it is unnecessary for a district court to repeat the exercise. In light of history, we hold that pueblos are subject to federal superintendence, and a district court may so presume. Further fact finding is only necessary in the event that the State makes a persuasive showing that circumstances regarding federal superintendence have changed in a significant way.
{18} This Court's conclusion regarding § 1151(b) is also supported by the seminal treatise in this field, Felix S. Cohen's Handbook of Federal Indian Law at 39.
Unlike section 1151(a), 18 U.S.C. § 1151(b) does not expressly include patented lands and rights-of-way within its terms. But the terms of section 1151(b) refer to residential Indian communities under federal protection, not to types of land ownership or reservation boundaries. Also, the full statute was intended to reduce earlier difficulties which had arisen from the "checkerboarding" of land ownership and rights-of-way. Thus, patented parcels of land and rights-of-way within dependent Indian communities should also be within Indian country. It must be inferred, however, that the statute intended to include only Indian communities with reasonably defined boundaries, and land ownership boundaries will often be the major factor in determining a community's outer borders.
Read together, 18 U.S.C. §§ 1151(a) and (b) employ a functional definition focusing on the federal purpose in recognizing or establishing a reasonably distinct location for the residence of tribal Indians under federal protection. This definition supplanted the earlier reliance on land title, which had become impractical owing to allotments, reservation openings and rights-of-way.
{19} The treatise raises the issue that there is some ambiguity in how Congress intended to treat fee land within § 1151(b) dependent Indian communities. Because § 1151(a) does specify how to treat fee land within a reservation, we too read § 1151(a) and (b) together. We determine that a pueblo satisfying § 1151(b) is sufficiently similar to a reservation in § 1151(a) to merit identical treatment for the purposes of criminal jurisdiction. Congress has often referred to pueblos as reservations before and after the enactment of § 1151. One hundred years ago, before New Mexico obtained statehood, Congress exempted from taxes land "within Pueblo reservations or lands, in the Territory of New Mexico." H. Res. 17474, 58th Cong., 33 Stat. 1048, 1069 (1905). In 1910, in order to become a state, Congress required New Mexico to forever prohibit "introduction of liquors into Indian country, which term shall also include all lands now owned or occupied by the Pueblo Indians of New Mexico." H. Res. 18166, 61st Cong., 36 Stat. 557, 558 (1910). Two years later, Congress allowed wine for sacramental use "at any place within the Indian country or any Indian reservation, including the Pueblo Reservations in New Mexico." 25 U.S.C. § 253 (1912). Since then, Congress has consistently used the word "reservation" broadly to encompass pueblo land. Some legislation concerning Indian country in general, including § 1151, does not use the word "pueblo." Examples cover environmental laws, education, transportation, judicial administration, and economic activities. See, e.g., Clean Water Act, 33 U.S.C. § 1377(h)(1) (1987), ("`Federal Indian reservation' means all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation;"); Indian Financing Act, 25 U.S.C. § 1452 (1974); Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450b (1975); Indian Child Welfare Act, 25 U.S.C. § 1903 (1978); National Indian Forest Resources Management Act, 25 U.S.C. 3103 (1990); Federal Highway Act, 23 U.S.C. § 101(a)(12) (1958); Indian Tribal Justice Act, 25 U.S.C. § 3653 (2000); Professional Boxing Safety Act of 1996, 15 U.S.C. § 6312 (1996); Consolidated Farm and Rural Development Act, 7 U.S.C. § 1985 (e)(i)(A)(ii) (1996). The State does not provide any example of Congress treating a pueblo distinctly from a reservation, especially not for the purposes of criminal jurisdiction in Indian country.
{20} Courts have adopted a broad view of the term reservation. To reconcile the word choice of reservation versus pueblo, we note that in United States v. McGowan, 302 U.S. 535 (1938), the United States Supreme Court found the linguistic difference to be immaterial and instead looked to the protections afforded by the Federal government. Id. at 538-39 (examining "reservation" versus "colony"). In a more recent case specifically addressing what is a reservation for the purposes of § 1151(a), the Tenth Circuit Court of Appeals stated "official `reservation' status is not dispositive" and that informal reservations are included in § 1151(a). United States v. Roberts, 185 F.3d 1125, 1131 (10th Cir. 1999). In Ortiz, 105 N.M. 308, 731 P.2d 1352, the New Mexico Court of Appeals reviewed a case in which the State charged an Indian defendant for a crime committed within a pueblo's exterior boundaries but also within the corporate limits of a non-Indian town. In holding that the State did not have jurisdiction, the court stated that, "land within the exterior boundaries of a Pueblo is indistinguishable from land lying within the exterior boundaries of an Indian reservation." Id. at 312, 731 P.2d at 1356. Our Court determined over 20 years ago that "Indian reservations and dependent Indian communities are not two distinct definitions of place, but definitions which largely overlap." Blatchford v. Gonzales, 100 N.M. 333, 335, 670 P.2d 944, 946 (1983) (specifically addressing § 1151).
{21} Our state courts have previously determined that pueblos are Indian country when deciding a case with similar facts and with a similar question presented to the Court of Appeals. In 1996, the State indicted an Indian defendant for an alleged crime within the exterior boundaries of the defendant's pueblo, but either on private fee land or a public thoroughfare in a non-Indian town. Ortiz, 105 N.M. 308, 731 P.2d 1352. The Indian defendant challenged the State's jurisdiction to prosecute and the Court of Appeals wrote:
Based on the relationship between the United States government and the Pueblo Indians, the Congressional action taken to confirm and hold in trust for the Pueblo Indians land granted them by the prior governments, and the unquestioned authority of Congress to enact legislation which affects that land, we are constrained to conclude that land lying within the exterior boundaries of an Indian Pueblo, such as the San Juan Pueblo, is "Indian country" within the meaning of Section 1151.
Id. at 312, 731 P.2d at 1356. The Court of Appeals held that the State did not have jurisdiction and remanded the case with instructions to dismiss the indictment. Id. at 312-13, 731 P.2d at 1356-57.
{22} Thus, given the overlapping nature of the terms reservation and pueblo and the overlapping nature of §§ 1151(a) and (b), we think it is fair to conclude, in the face of congressional silence, that the fee land within a § 1151(b) dependent Indian community is Indian country just like the fee land within a § 1151(a) reservation.

B. Congressional Intent to Change Status Under § 1151
{23} Now that we have determined that lands within the exterior boundaries of Taos and Pojoaque Pueblos are Indian country within the meanings given in § 1151, we next consider if Congress ever showed clear intent to extinguish Indian title to the alleged crime sites within Taos or Pojoaque Pueblos' exterior boundaries. DeCoteau v. Dist. County Ct., 420 U.S. 425, 444 (1975) (holding that ambiguities are resolved in favor of Indians unless congressional intent is clear). The State argues that Congress has shown a clear intent to extinguish; Defendants Romero and Gutierrez argue that Congress has not diminished Indian country. We decide that Congress has not shown clear intent to extinguish Indian country status, so Indian country status for the privately-held parcels within Taos and Pojoaque Pueblos' exterior boundaries has not been extinguished.[3] Two issues require resolution in order to reach this conclusion. First, both cases necessitate that we determine if Indian country status is extinguished for parcels of private claim land within Indian country's exterior boundaries. Second, Defendant Romero's case asks that we decide if a non-Indian town's existence within the Indian pueblo alters Indian country status.
{24} We follow in the footsteps of the United States Supreme Court, which decided both these issues over 40 years ago in a case with substantially similar facts. In Seymour, 368 U.S. 351, Washington State prosecuted an Indian for a crime committed on Indian land that the Indian defendant argued was Indian country within § 1151. Washington State argued that Indian country no longer existed because the land was held in fee by a non-Indian, which is New Mexico State's argument in regard to Defendant Gutierrez and Pojoaque Pueblo. Washington State also argued that the land was subject to state jurisdiction because a town had been established on the site, which is New Mexico State's argument in regard to Defendant Romero and Taos Pueblo. The United States Supreme Court rejected both arguments and found that the land in question remained Indian country within § 1151.
The contention is that, even though the reservation was not dissolved completely by the Act permitting non-Indian settlers to come upon it, its limits would be diminished by the actual purchase of land within it by non-Indians because land owned in fee by non-Indians cannot be said to be reserved for Indians. This contention is not entirely implausible on its face and, indeed, at one time had the support of distinguished commentators on Indian Law. But the issue has since been squarely put to rest by congressional enactment of the currently prevailing definition of Indian country in § 1151 to include `all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent . . . .'
Id. at 357-58 (footnote omitted). Divesting a reservation of its land is such a drastic measure that it can only be accomplished by Congress, not by individual land sales. Solem v. Bartlett, 465 U.S. 463, 470 (1984). In regard to the town established within the exterior boundaries of Indian country, the State here, like the State in Seymour, unpersuasively argues that § 1151 reduces federal responsibility for Indians who live within the pueblo simply because non-Indians have moved in. Seymour, 368 U.S. at 359. "Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." Solem, 465 U.S. at 470. Absent a clear congressional statement to change the status, the fact that the land is encompassed by the pueblo controls the jurisdictional issue. Ortiz, 105 N.M. at 312, 731 P.2d at 1356. In sum, location within the exterior boundaries matters more than who holds title.
{25} We next consider congressional action that could have extinguished Indian country status. Case law demands that any act on which the State relies "provide substantial and compelling evidence of a congressional intention to diminish Indian lands. . ." Solem, 465 U.S. at 472. The precise statutory language used to open Indian lands serves as the best evidence of intent. Id. at 470. The State argues that Congress has given an explicit indication of extinguishment in the Pueblo Lands Act, which is "An Act To quiet the title to lands within Pueblo Indian land grants, and for other purposes." S. 2932, 68th Cong., 43 Stat. 636 (1924). We turn to the language of the Pueblo Lands Act. The Act specifically mentions title, but does not mention tribal or federal versus state jurisdiction, nor ever allude to a change in the land's Indian country status. The Act does allow for "a suit to quiet title to the lands described . . . as Indian lands the Indian title to which is determined . . . not to have been extinguished." 43 Stat. at 637. Due to the lack of substantial and compelling evidence of congressional intent to change Indian country status, we must reject the State's overly-broad interpretation that the Pueblo Lands Act extinguishes Indian country status merely by allowing non-Indians to have fee title to certain parcels. The Pueblo Lands Act falls far short of being "substantial and compelling evidence" as required by Solem. Thus, "we are bound by our traditional solicitude for the Indian tribes to rule that . . . the old reservation boundaries survived the opening." Solem, 465 U.S. at 472. The fact that Taos Town ended up within the exterior boundaries of Taos Pueblo does not diminish or extinguish Indian country; nor does the individually owned private claim land in the middle of Pojoaque Pueblo affect Indian country status there.

IV. CONCLUSION
{26} The privately-held fee lands within the exterior boundaries of both Taos and Pojoaque Pueblos are Indian country within the meaning of § 1151(b) and Congress has not extinguished Indian country status. Therefore, the lands in question remain Indian country, and the State does not have jurisdiction to prosecute the alleged crimes occurring there. The Court of Appeals is reversed and the district court is affirmed in both cases.
{27} IT IS SO ORDERED.
_________________________________
PATRICIO M. SERNA, Justice
WE CONCUR:
_________________________________
RICHARD C. BOSSON, Chief Justice
_________________________________
PAMELA B. MINZNER, Justice
PETRA JIMENEZ MAES, Justice (specially concurring)
EDWARD L. CHÁVEZ, Justice (specially concurring)
CHÁVEZ, Justice (specially concurring).
{28} I agree with the majority that the State has no jurisdiction in these cases. In each case the accused is an enrolled member of the pueblo, which satisfies the definition of Indian within the Major Crimes Act, 18 U.S.C. § 1153, and the crimes occurred within the exterior boundaries of the pueblo. I share the view that "Congress and the United States Supreme Court have established that pueblo lands are Indian country." Maj. Op. P13. The United States Supreme Court has clearly stated that pueblos are dependent Indian communities:
As before indicated, by an uniform course of action beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the government have regarded and treated the Pueblos of New Mexico as dependent communities entitled to its aid and protection, like other Indian tribes, and . . . this assertion of guardianship over them cannot be said to be arbitrary, but must be regarded as both authorized and controlling.
United States v. Sandoval, 231 U.S. 28, 47 (1913). Therefore, the land within the exterior boundaries of New Mexico pueblos fits squarely within the definition of dependent Indian community as codified in 18 U.S.C. § 1151(b).
{29} I write separately because I respectfully believe the discussion of Alaska v. Native Vill. of Venetie Tribal Gov't, 522 U.S. 520 (1998), goes beyond what is necessary for resolution of this case. Venetie, insofar as it mentioned the pueblos, simply confirmed what was said in Sandoval, that the pueblos were dependent Indian communities over which Congress "could exercise jurisdiction over the Pueblo lands, under its general power over `all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired.'" Venetie, 522 U.S. at 528 (quoting Sandoval, 231 U.S. at 46). The Venetie analysis and its two prong test is not necessary when a crime is committed within the exterior boundaries of a New Mexico pueblo, since pueblos have already been recognized as Indian country. It is only when a crime is committed within lands of questionable Indian country status that the Venetie analysis is necessary. Venetie, 522 U.S. at 30 (stating that section 1151 does not alter the definitions of Indian country as described in earlier cases, including Sandoval).
{30} Of particular concern are the suggestions in the majority opinion that under Venetie fact-finding is or may be required to determine whether a pueblo has been set aside and under federal superintendence. See Maj. Op. P15 (referring to district judge's fact findings as also satisfying the set aside requirement), and P17 (which acknowledges a presumption of federal superintendence based on federal and state cases recognizing federal superintendence of pueblos, but goes on to suggest fact-finding may become necessary). In my opinion the only fact-finding necessary for the inquiry into criminal jurisdiction on pueblo lands is: a) whether the alleged crime was committed within the exterior boundaries of a pueblo, and b) whether the accused is an Indian within the meaning of the Major Crimes Act, 18 U.S.C. § 1153. If an analysis were required under Venetie I would conclude that the "set-aside" of the pueblo lands by the federal government occurred at the time it confirmed the pueblo land grants. Act of Dec. 22, 1858, 35th Congress, 11 Stat. 374 (1859). I would also conclude that "superintending control" of the pueblos has been shown through the Pueblo Lands Act, where Congress exercised "its sovereign capacity as guardian of said Pueblo Indians." Pueblo Lands Act of June 7, 1924, ch. 331, 43 Stat. 636. I would not require our courts to conduct an evidentiary hearing when the parties agree, as they did in both these cases, that the crime occurred within the exterior boundaries of a pueblo and the accused meets the requirements of the Major Crimes Act, 18 U.S.C. § 1153. "If an extensive factual inquiry is necessary to make a jurisdictional determination . . . criminal trials will be delayed." State v. Ortiz, 105 N.M. 308, 312, 731 P.2d 1352, 1356 (Ct. App. 1986).
{31} I also respectfully disagree with the majority's use of the diminishment or extinguishment analysis as applied to the pueblos. I am not persuaded that Congress may unilaterally alter pueblo boundaries the way it may diminish or extinguish reservation lands. Because Congress creates reservations,[4] it also retains the authority to diminish or extinguish the reservation and dedicate the land to public use. See Hagen v. Utah, 510 U.S. 399, 402-415 (1994) (describing a Congressional Act of 1864 setting apart lands for the Uintah Valley Reservation and subsequent diminishment of that reservation by congressional act and resulting change in status of criminal jurisdiction in lands restored to public domain). Unlike reservations created by Congress, Congress relinquished all title and claim of the United States to the lands within the pueblos when it confirmed the pueblo grants. Act of Dec. 22, 1858, 35th Congress., 11 Stat. 374 (1859). This is one of the unique, historical, and still significant differences between the pueblo lands and the reservations of other Indian tribes. Clearly, alteration of reservation boundaries by Congress will change the jurisdictional status of those lands as illustrated in Venetie and Hagen. Land within the exterior boundaries of the pueblos is Indian country under 18 U.S.C. § 1151 unless Congress has given clear indication of its intent to change its jurisdictional status, regardless of the title of the land within the boundaries.
{32} There is no evidence that Congress has changed criminal jurisdiction within the exterior boundaries of any pueblo. In fact, the history of the Pueblo Lands Act irrefutably evinces congressional intent not to change criminal jurisdiction within the exterior boundaries of the pueblos. The original version of the Act, known as the Bursum Bill, contained this language:
SEC. 3. That the State of New Mexico and the courts thereof shall have jurisdiction over all lands and in all questions arising in relation thereto, which shall have been segregated from any of the pueblo grants hereinbefore enumerated by final decree, as well as also over all lands and as to all questions or controversies arising in relation thereto which have ceased to be reservations as hereinbefore provided, or which shall have been legally sold or disposed of by any of said pueblos or any Indian or Indians thereof, as now or hereafter provided by law.
62 Cong. Rec. 12324 (1922). This version of the bill was defeated following strong national dissent to the Bursum Bill. See 138 Cong. Rec. E328-01 (1992) (describing a 1922 meeting of the All-Pueblo Council gathered at Santo Domingo Pueblo to protest the Bursum Bill). The final version of the Pueblo Lands Act deleted this jurisdictional section despite considerable debate, as illustrated by the following exchange during the 1923 congressional hearings:
Senator LENROOT. It is agreed, then, that section 3 may be eliminated?
Commissioner BURKE. Yes.
Senator JONES of New Mexico. I do not know about that, Mr. Chairman. I rather think there is a situation there which ought to be dealt with. The pueblo grants, according to their outlying boundaries, are made Indian country by the enabling act, and because we might segregate those lands as between the individual occupants, as between the Indian and the non-Indian, I do not think it follows what was given to the non-Indians would cease to be Indian country in the absence of some legislation on the subject.
Senator BURSUM. What about criminal jurisdiction? Might not that be involved?
Senator JONES of New Mexico. That is what I refer to, the question of eliminating them from what we understand by the term "Indian country." I do not think, just offhand, we ought to eliminate that section. I believe there is something there we ought to think about. But we can do that later.
Hearings on S.3855 and S.4223 Before the Subcomm. of the Senate Comm. on Public Lands and Surveys, 67th Cong., 4th Sess. 89 (1923). Congress did not act "later" to remove Indian country status from any of the lands within the exterior boundaries of the pueblos, and clearly did not alter criminal jurisdiction affecting Pueblos. It was not until recently that Congress amended the Pueblo Lands Act to address the jurisdictional issue. Maj. Op. n.1. Congress confirmed criminal jurisdiction in the Pueblos and the United States and specifically noted that the State of New Mexico only has jurisdiction over an offense committed by a person who is not a member of a Pueblo or an Indian, provided the offense is not subject to the jurisdiction of the United States. Pueblo Lands Act of 1924, ch. 331, 43 Stat. 636, amended by S. 279, 109th Cong., 119 Stat. 2573 (2005). Thus, both the Pueblo Lands Act and its legislative history fail to provide substantial and compelling evidence of congressional intent to alter the criminal jurisdiction applicable to crimes committed on pueblo lands by tribal members.
{33} Because I agree that the State does not have jurisdiction over criminal offenses committed by tribal members within the exterior boundaries of pueblos, I concur in the result reached by the majority.
NOTES
[1] Congress amended the Pueblo Lands Act, S. 2932, 68th Cong., 43 Stat. 636 (1924), after the briefing, oral argument, and submission of the pending cases to this Court. See S. 279, 109th Cong., 119 Stat. 2573 (2005). President George W. Bush signed the amendment, Senate Bill 279, on December 20, 2005. Although this amendment helps clarify congressional intent regarding jurisdiction, it was enacted after the alleged crimes occurred and therefore does not control disposition of these appeals.
[2] We note that if the United States Supreme Court disagreed with this Court, and instead held that a pueblo is either a reservation or a dependent Indian community, the outcome of these cases would still be the same: the lands in question are Indian country and the State does not have jurisdiction.
[3] The State specifically uses the word "extinguish" because that is the word used in the Pueblo Lands Act. Defendants use the word "diminish." The State argues that diminish is incorrect here because diminishment applies only to reservations, not dependent Indian communities. We disagree and take a broader view. For purposes of resolving whether the land in question is currently Indian country in general and beyond the State's criminal jurisdiction, the extinguish versus diminish debate is not significant.
[4] See Creation of Indian reservations, 25 U.S.C. § 211 (1918) (stating "[N]o Indian reservation shall be created, nor shall any additions be made to one heretofore created, within the limits of the States of New Mexico and Arizona, except by Act of Congress."); see also New Indian reservations, 25 U.S.C. § 467 (1934) (authorizing the Secretary of the Interior to proclaim new Indian reservations and to add lands to existing reservations).