**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMSC-044**

**Filing Date:**     **August 26, 2009**

**Docket No. 31,263**

**ANGELINA GARCIA, formerly**
**known as ANGELINA GUTIERREZ,**

          **Petitioner-Petitioner,**
**v.**

**MATTHEW GUTIERREZ,**

          **Respondent-Respondent.**

**ORIGINAL PROCEEDING ON CERTIORARI**
**Barbara J. Vigil, District  Judge**

Atkinson & Kelsey, P.A.
Thomas C. Montoya
Albuquerque, NM

for Petitioner

Michael Schwarz
Santa Fe, NM

for Respondent

## OPINION

**BOSSON, Justice.**

**{1}**     There are occasions, and this is one, when this Court can give no definitive answer to the increasingly complex jurisdictional disputes between state and tribal courts.  Given its plenary authority over Indian matters, Congress could provide such answers, but it has not.  We do our best to fill the void.

**{2}**     In this case—a divorce and custody dispute between an Indian father and a non-Indian mother whose children are enrolled members of the Pojoaque Pueblo—state and

1

tribal courts have entered conflicting decrees. Regrettably, complete resolution of that conflict lies beyond our reach.

**{3}** What we can do, however, is conclude that the state court does have jurisdiction. The tribal court—given the importance of the Pueblo's children to its culture and its future—likely has jurisdiction; and neither is exclusive of the other. As has long been the tradition in New Mexico, the state and tribal courts must share jurisdiction under principles of comity and work out their differences, guided by universally accepted principles of doing what is in the best interests of the children. *See Fox v. Doak*, 78 N.M. 743, 744, 438 P.2d 153, 154 (1968) ("In making [a child-custody determination, a court's] controlling influence should be the welfare and best interests of the child.").

**{4}** The Court of Appeals held that the state court did not have jurisdiction, to some degree because this dispute arose on private fee land surrounded by the Pojoaque Pueblo, land characterized as "Indian country." While we assume the fee land here is "Indian country," consistent with our holding in *State v. Romero*, 2006-NMSC-039, 140 N.M. 299, 142 P.3d 887, we nonetheless hold that the "Indian country" paradigm is insufficient to resolve the present action. We do so in light of the current state of federal decisional law and our own state statute. We therefore reverse the Court of Appeals and remand to state district court for further proceedings.

**BACKGROUND**

**{5}** This case shares many of the same facts, and one of the same parties, as our opinion in *Romero*, 2006-NMSC-039. In that case, the issue was whether non-Indian fee land surrounded on all sides by Indian land, and located within the exterior boundaries of the Pojoaque Pueblo, can support state-court criminal jurisdiction over tribal members. We held in *Romero* that the state does not have jurisdiction. *Id.* ¶ 26. Here, we address the child-custody dispute which arose after the criminal events in *Romero*.

**{6}** Angelina Garcia married Matthew A. Gutierrez on October 17, 1998. The couple spent much, but not all, of their four years of married life on Pueblo of Pojoaque lands. When the couple lived off the Pueblo for a time, while Gutierrez attended the Southwestern Indian Polytechnic Institute in Albuquerque, they remained in New Mexico. Gutierrez ("Husband") is an enrolled member of the Pojoaque Pueblo and Garcia ("Wife") is not Indian. They have two children, both of whom are enrolled members of the Pueblo.

**{7}** After a series of domestic violence incidents in which Husband allegedly beat Wife, she decided to leave him. On August 25, 2002, she took the children and moved to her father's house, which is on non-Indian-owned fee property within the exterior boundaries of the Pojoaque Pueblo. That same day, after Husband realized Wife had left, he went to her father's house and repeatedly stabbed her brother. Husband's subsequent criminal prosecution led to the *Romero* opinion. 2006-NMSC-039.

2

**{8}**     The day after the stabbing, the district court of Santa Fe County awarded Wife temporary custody of the children.  On October 9, 2002, two months later, Wife filed a petition for dissolution of marriage, also in state district court.  Twenty days later, Husband filed a parallel divorce action in Pojoaque tribal court and, shortly thereafter, filed a motion to dismiss in district court, asserting that the state district court lacked jurisdiction to hear the case.  The district court denied Husband's motion.

**{9}**     It appears from the record that Wife never entered an appearance in tribal court, and, despite receiving notice, refused to participate in the tribal court proceedings. The tribal court, on April 26, 2004, entered a decree awarding Wife and Husband joint custody, noting that, because Wife failed to appear, she was "wholly in default."  The tribal court, as a matter of comity, recognized the state district court's jurisdiction to enter a divorce order, but concluded "[a]s a matter of federal common law and Indian common law" that the Pueblo had exclusive jurisdiction "over the welfare of enrolled tribal children members who have resided a vast majority of their lives on pueblo lands."  Husband sought to have the tribal decree enforced in district court, which denied the motion.

**{10}**    In September 2005, the district court entered a divorce decree, but has not entered a final custody determination.  On January 11, 2006, it entered amended findings of fact and conclusions of law, concluding that it had subject matter jurisdiction over the dissolution of the marriage, as well as over issues of custody, child support, distribution of assets and debts, and attorney fees.  The court entered a partial final order on January 19, 2006, adopting its findings of fact and conclusions of law.  Husband initially appealed from this order.

**{11}**    The Court of Appeals reversed the district court, concluding that only the tribal court had jurisdiction over the child-custody issue. *Garcia v. Gutierrez*, 2008- NMCA-116, ¶ 25, 144 N.M. 761, 192 P.3d 275.  Wife petitioned this Court for a writ of certiorari, which we granted to decide whether the state court had jurisdiction to decide child-custody issues. *Garcia v. Gutierrez*, 2008-NMCERT-008, 145 N.M. 255, 195 P.3d 1267.  We now reverse the Court of Appeals and remand to the district court.  We hold that the district court has jurisdiction over child-custody issues.  For reasons explained in detail below, we further conclude that the district court's jurisdiction is not exclusive, but rather is concurrent with what we assume is valid tribal court jurisdiction.

## DISCUSSION

### District Court Jurisdiction

**{12}**    The sole question before this Court is whether the state has jurisdiction over the child-custody dispute.  We do not decide the parameters of tribal court jurisdiction over the same subject matter.  One state statute and one federal statute govern our inquiry.  We begin with the state statute, the Uniform Child-Custody Jurisdiction and Enforcement Act ("UCCJEA"), NMSA 1978, §§ 40-10A-101 to -403 (2001), because it is dispositive.  We

then turn to an analysis of the federal statute, the Parental Kidnapping Prevention Act ("PKPA"), 28 U.S.C. § 1738A (2000), which we determine does not by its own terms apply to this case.[1]

**UCCJEA**

{13}   State legislatures around the nation, including our own, have passed the UCCJEA to combat the problem of conflicting child-custody orders and an epidemic of forum-shopping by parents unsatisfied with child-custody decrees in their home states. All fifty states have passed versions of the UCCJEA or its similar predecessor, the Uniform Child-Custody Jurisdiction Act ("UCCJA"). The statute sets up a two-tiered approach for determining what state has jurisdiction over child-custody matters. First, for purposes of the statute, it asks, which state is the "home state"? *See* § 40-10A-201(a)(1)-(4). If one state can be established as the "home state," and a child-custody action is filed first in that state, any other states which have passed a similar statute must stay their proceedings, or decline to exercise jurisdiction. *See* § 40-10A-206. Once the "home state" reaches a final judgment, it has continuing jurisdiction, subject to several conditions. *See* § 40-10A-202(a)(1)-(2).

{14}   If this first tier of analysis is exhausted with no state qualifying as the "home state" within the meaning of the UCCJEA, the analysis then shifts to the second tier. Here, a court is to ask whether the child and at least one parent have "significant connections" with either state. *See* § 40-10A-201(a)(2)(A). The first action filed in a state with "significant connections" preempts any action later filed in another state. *See* § 40-10A-206.

**Applicability to Tribes**

{15}   Before applying the UCCJEA to the facts of the present case, we note an anomaly in the way the statute applies in our state. Specific language in the UCCJEA commands courts of this state to treat a tribe "as if it were a state of the United States" for purposes of the statute's jurisdiction provisions. Section 40-10A-104(b). In other words, New Mexico district courts are bound to honor the decisions of tribal courts for continuing jurisdiction purposes, provided that the requirements of the UCCJEA have been met. This legislation, however, has no power to similarly bind the tribal courts, because unless the tribes have passed legislation similar to the UCCJEA, they are not subject to its commands. As for the similar PKPA, a federal statute, tribal courts in theory could be bound by its provisions and, therefore, be required to give full faith and credit to state-court judgments, because of Congress's plenary power over the tribes. As we will explain below, however, the PKPA by its terms does not apply to tribes. For reasons set forth in detail below, we conclude that under the UCCJEA, the State has proper jurisdiction, but that jurisdiction is not exclusive of the tribe. *But see Gerber v. Eastman*, 673 N.W.2d 854, 858 (Minn. Ct. App. 2004)

---

[1]The parties correctly agree that the Indian Child Welfare Act, 25 U.S.C. § 1901-1923 (2000) does not apply to child-custody proceedings stemming from divorces.

(assuming that Minnesota state-court jurisdiction under that state's UCCJEA precludes tribal jurisdiction, without discussing whether the Chippewa tribe had passed similar legislation).

**Application to Present Facts**

{16}   The parties appear to agree that both New Mexico and Pojoaque Pueblo have "significant connections" within the meaning of the UCCJEA and that the state-court action was filed first. Therefore, under the UCCJEA New Mexico would have "significant connections" jurisdiction unless the Pueblo qualifies as the "home state" as defined by the Act. The dispute therefore reduces to the question of whether there is a "home state."

{17}   The UCCJEA defines a child's "home state" as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding." Section 40-10A-102(7). Under the Act, Indian tribes are expressly treated as states in determining "home state" status. Section 40-10A-104(b). A state has "home state" jurisdiction under the UCCJEA if (1) that state qualifies as the home state at the commencement of the action, or (2) if the state was the "home state" within the critical six-month period, but the child was removed, so long as one parent "continues to live" in the home state. Only the first type of "home state" jurisdiction is at issue here. The district court found, and the parties do not dispute, that Husband did not continue to live on Pojoaque Pueblo lands after Wife took the children to her father's fee land.[2] He was in jail for part of that time, and did not live again on Pueblo lands until more than two years after the stabbing incident.[3]

{18}   Turning to the first type of home-state jurisdiction—six continuous months in a single jurisdiction, immediately before the action is filed—Wife agrees that New Mexico does not qualify as the "home state" for purposes of the UCCJEA, because it is clear that the children resided on the Pojoaque Pueblo for a significant portion of the critical six-month period. Therefore, our inquiry focuses on whether Pojoaque Pueblo qualifies as the "home state." If it does, the statute dictates that the tribal court has exclusive jurisdiction over the

---

[2]We note, without deciding, that if Husband had continued to live on Pojoaque Pueblo lands, and Wife had filed in district court as she did, before being outside the Pueblo for six full months, a good argument could be made that the Pueblo would have home-state jurisdiction under the second, or "recent home-state jurisdiction," category. However, we also note, again without deciding, that once Wife had been outside the Pueblo for six months with the child, a good argument could be made that New Mexico would achieve home-state jurisdiction if Wife filed after the six-month period concluded, regardless of whether Husband had stayed on the Pueblo or not.

[3]We interpret "continues to live" by its plain meaning, and not as a synonym for "residency" or "domicile"—both terms which carry legal meaning different from merely *living* in a location.

5

child-custody issue. If it does not, the district court's exercise of jurisdiction was proper under the UCCJEA, because the divorce action was first filed in state court, which had valid jurisdiction pursuant to the "significant connections" prong of the UCCJEA.

**{19}** The "home state" question, in turn, revolves around the status of the fee land owned by Wife's father. If this non-Indian fee property qualifies as Pojoaque Pueblo territory for purposes of civil jurisdiction, then the Pueblo has "home-state" jurisdiction, because the children spent the six months prior to the filing of the district court divorce action in what the UCCJEA would characterize as the "home state" of the Pojoaque Pueblo. If, however, the fee land is not Pueblo territory, the district court properly exercised "significant connections" jurisdiction, because Wife and the children would have spent only about four-and-a-half-months of the UCCJEA's critical six-month period within the Pojoaque Pueblo.

**{20}** The district court concluded there was no "home state" within the meaning of the UCCJEA because "neither parent lived with the children in any state (or tribal jurisdiction) for at least six consecutive months immediately before the commencement of this child-custody proceeding." The district court concluded that, because the children had no "home state," it could exercise "significant connections" jurisdiction under Section 40-10A-201(a)(2)(A).

**{21}** In reversing the district court, the Court of Appeals concluded that the disputed fee land qualified as Pojoaque Pueblo territory. The Court concluded that the six weeks the children spent on the fee land constituted time on the Pueblo, thereby making Pojoaque the "home state" within the meaning of the UCCJEA. *Garcia*, 2008-NMCA-116, ¶ 23. The Court of Appeals reached this conclusion by relying on 18 U.S.C. § 1151 (2000), the federal statute which governs criminal jurisdiction on Indian lands. That statute defines "Indian country" as

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

*Id.*

**{22}** The pertinent subsection here is Section 1151(b). We acknowledge that there is probably some room for debate whether Section 1151(a) also applies to pueblos, but we need not venture into that argument because we affirm *Romero*, which relied on Section 1151(b). *See Romero*, 2006-NMSC-039, ¶¶ 10-12 (observing that *Alaska v. Native Vill. of Venetie*,

6

522 U.S. 520, 520-21 (1998), appeared to conclude that a particular parcel of "Indian country" land could not be both (a) and (b) of Section 1151 Indian country, but not deciding that issue as it applies to New Mexico pueblos, and noting that *Venetie* did not consider "the unique circumstances of New Mexico's pueblos").

**{23}** Citing *Romero*, the Court of Appeals in this case concluded that Section 1151 applies in civil cases, and more specifically to the case at bar. *Garcia*, 2008-NMCA-116, ¶ 23. The Court of Appeals reasoned that because the non-Indian fee land in this case was "Indian country" within the meaning of Section 1151(b) for purposes of criminal jurisdiction, and, because this Court in *Tempest Recovery Services, Inc. v. Belone*, 2003-NMSC-019, ¶¶ 10-12, 134 N.M. 133, 74 P.3d 67, stated that Section 1151 also applies in civil cases, it must be considered tribal land for purposes of determining jurisdiction under the UCCJEA, a civil statute. *See Garcia*, 2008-NMCA-116, ¶ 23. We disagree. For the reasons that follow, we conclude that the Section 1151 "Indian country" paradigm cannot apply to all civil disputes, and particularly to the determination of "home-state" status under the UCCJEA.

**{24}** Section 1151 applies explicitly only in criminal cases. It says nothing about civil cases. However, there is little doubt in light of our case law, as well as federal decisional law, that Section 1151 has been applied in both criminal and civil contexts. *See Romero*, 2006-NMSC-039, ¶ 26; *see also Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 126 (1993) (concluding that the issue of whether certain tribe members may be subject to a state excise tax depends, in part, on whether they live in "Indian country" as defined in Section 1151); *Cal. v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 n.5 (1987) (stating Section 1151's definition of Indian country "applies to questions of both criminal and civil jurisdiction," and citing *DeCoteau v. District County Court*, 420 U.S. 425, 427 n.2 (1975)). *See generally*, *Cohen's Handbook of Federal Indian Law* § 3.04[1], at 182 (Nell Jessup Newton ed. 2005) ("The modern definition of Indian country is found in the criminal code, but applies in the civil context as well." (Footnote omitted.)).

**{25}** Broad assertions that Section 1151 applies in all civil contexts, however, cannot be squared with what the U.S. Supreme Court has held in a line of cases starting with *Montana v. United States*, 450 U.S. 544 (1981). As we will explain, the *Montana* cases amount to a broad rejection of tribal civil authority over non-Indians where non-Indian fee land is involved, even where that fee land is surrounded on all sides by tribal territory. Put another way, if it were true that the criminal-law concept of Section 1151 "Indian country" carried over to all civil disputes, the holdings in the *Montana* cases could not stand. Thus, the Court of Appeals' view of Section 1151 was overly broad given the state of U.S. Supreme Court case law.

**{26}** Strangely, the *Montana* cases largely fail to address the applicability of Section 1151. As we explain below, this silence amounts to a rejection of the Section 1151 paradigm in a specific type of civil case like the one before us now—which renders the Section 1151 "Indian country" concept largely irrelevant here. We therefore reject the assertion of Husband and of the Court of Appeals that the fee land at issue here is part of the Pojoaque

7

Pueblo for purposes of the UCCJEA simply because it is "Indian country." In fact, we assume that it is "Indian country." But that designation, the *Montana* cases teach, is inoperative in this particular type of civil case, where tribal civil jurisdiction over a non-Indian on non-Indian fee land is at issue.[4] As a result, we are compelled to conclude that the fee land in this case cannot be considered Pojoaque territory for purposes of determining a "home state" under the UCCJEA.

**The *Montana* Cases**

**{27}** In *Montana*, the U.S. Supreme Court held that the Crow tribe lacked authority to regulate the hunting and fishing of non-Indians on non-Indian fee land located within tribal boundaries. 450 U.S. at 566-67. The cases following in the *Montana* line have severely limited Indian civil authority over non-Indians on non-Indian fee lands surrounded by Indian lands. The Court has even gone so far as to note in a footnote that, "after *Montana*, tribal sovereignty over nonmembers 'cannot survive without express congressional delegation,' and is therefore not inherent." *South Dakota v. Bourland*, 508 U.S. 679, 695 n.15 (1993) (quoting *Montana*, 450 U.S. at 564). The cases do not go so far as to completely erase tribal authority over nonmembers where there is no congressional delegation of such authority, but they have clearly restricted such authority.[5] *See Nev. v. Hicks*, 533 U.S. 353, 365-68 (2001) (finding no tribal jurisdiction over civil-rights claim by Indian against non-Indian police who searched Indian's house on tribal lands); *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 645 (2001) (finding no tribal authority to tax a private hotel on non-Indian fee land within the

---

[4]If Wife were Indian, the outcome would likely be different, because a tribe's civil jurisdiction over tribal members is unchallenged by the *Montana* line of cases.

[5]The *Montana* cases acknowledge three narrow exceptions to the general rule against tribal jurisdiction over non-Indians in cases arising on non-Indian fee land. First, a federal statute or constitutional provision may provide tribal jurisdiction. Second, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565. Third, a tribe may exercise "civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id*. at 566. These exceptions have been interpreted quite narrowly. *See Atkinson Trading Co.*, 532 U.S. at 647 (describing the exceptions as "limited"). Marital and other familial relationships do not qualify under the "consensual relationships" exception, which has been held to apply only to business relationships. *See, e.g.*, *Boxx v. Long Warrior*, 265 F.3d 771 (9th Cir. 2001) (noting that *Montana*'s "consensual relationship" exception requires that "the relationship must be both consensual *and* entered into through commercial dealings, contracts, leases, or other arrangements," and that "courts have inferred that qualifying relationships only arise from some form of commercial transaction" (citation and internal quotation marks omitted)).

exterior boundaries of the Navajo Nation); *Strate v. A-1 Contractors*, 520 U.S. 438, 459 (1997) (finding no tribal court jurisdiction for a personal injury action between two non-Indians for an automobile crash on a federal right-of-way surrounded by an Indian reservation). *See generally* William C. Canby, Jr., *American Indian Law in a Nutshell* 205 (4th ed. 2004) ("With the *Montana* 'rule' broadly applicable throughout reservations, the extent of . . . tribal court jurisdiction over nonmembers is subject to great limitation."); L. Scott Gould, *The Consent Paradigm: Tribal Sovereignty at the Millennium,* 96 Colum. L. Rev. 809, 814 (1996) ("With very few exceptions, inherent powers now extend to only tribal members . . . and to nonmembers who enter into consensual relationships with tribes."). *But see* Philip P. Frickey, *Adjudication and its Discontents: Coherence and Conciliation in Federal Indian Law,* 110 Harv. L. Rev. 1754, 1768 (1997) (asserting that Gould "falls victim . . . to the desire to impose an artificial coherence upon the field," and describing Gould's theory as "riddled with exceptions that deprive it of the quality of a coherent theoretical framework").

**{28}** The U.S. Supreme Court recently reaffirmed the proposition, initially stated in *Atkinson Trading Co.*, 532 U.S. at 659, that a tribe's efforts to exert civil authority over nonmembers on non-Indian fee land are "presumptively invalid." *See Plains Commerce Bank v. Long Family Land & Cattle Co.*, 128 S. Ct. 2709, 2720 (2008) (finding no tribal jurisdiction over discrimination claim concerning a non-Indian bank's sale of fee land within tribal boundaries). In the same case, the Court also reaffirmed that "once tribal land is converted into fee simple, the tribe loses plenary jurisdiction over it." *Id.* at 2719. *See generally Cohen's*, *supra* § 7.02[1][a], at 600-01 ("[W]hen nonmembers have a right to be in Indian country by virtue of land ownership, the usual presumption favoring tribal jurisdiction is reversed.").

**{29}** Only one of the *Montana* cases directly addresses whether Section 1151 "Indian country" applies in cases like ours, where Indian civil authority over a non-Indian on non-Indian fee land is at issue. In *Atkinson Trading Co.*, the Court held that the Navajo Nation lacked civil authority to tax a private hotel which was owned by a non-Indian and was located within the exterior boundaries of the Navajo Nation. 532 U.S. at 653-54. Important to the *Atkinson* Court, the hotel, though within the exterior boundaries of the Navajo reservation, was on non-Indian fee land. *Id.* at 653. In a footnote, the Court rejected out of hand the application of the Section 1151 "Indian country" analysis. "Section 1151 simply does not address an Indian tribe's inherent or retained sovereignty over nonmembers on non-Indian fee land." *Atkinson*, 532 U.S. at 653 n.5.

**{30}** Elsewhere, the *Montana* cases mention Section 1151 only in passing, if at all. *See, e.g., Strate*, 520 U.S. at 454 n.9 (noting the fact that Section 1151(a) treats rights-of-way as part of Indian country, while another statute does not); *Montana*, 450 U.S. at 562 (observing that a federal trespassing statute did not incorporate the Section 1151 definition of "Indian country," which the Court takes to be an indication that Congress did not want to include non-Indian fee lands within its scope). To the extent the footnote in *Atkinson Trading Co.* does not voice an explicit rejection of the applicability of Section 1151 and of exclusive

9

Indian civil authority in the present context, the other cases in the *Montana* line, taken as a whole, amount to an *implicit* rejection of the Section 1151 paradigm on facts like those now before us.[6]

**{31}** The reason is that, if the U.S. Supreme Court had applied Section 1151 to the *Montana* cases in the way in which our Court of Appeals believed it should be applied here, the U.S. Supreme Court would have had to conclude, in each of the *Montana* cases discussed above, that the tribes had exclusive civil authority. In each case, the U.S. Supreme Court concluded the opposite, of course. The problem with our Court of Appeals' analysis emerges upon a step-by-step analysis of that Court's reasoning.

**{32}** The logic our Court of Appeals followed was (1) non-Indian fee land surrounded by tribal land is "Indian country," and (2) "Indian country" connotes tribal jurisdiction in both civil and criminal matters, and (3) the tribe must therefore have exclusive jurisdiction here. The *Montana* cases make clear that this analysis is too simplistic. In each case except *Venetie*, the Court analyzed non-Indian fee land surrounded by tribal land and concluded that the tribe had no exclusive jurisdiction, at least as far as non-Indians were concerned. Although our case addresses state jurisdiction, not tribal jurisdiction, the *Montana* cases nonetheless show that it is not enough merely to conclude that a certain plot of land is, or is not, "Indian country." Courts must also consider whether the parties involved are tribal members or not, and the type of case at issue. Where tribal jurisdiction over non-Indians on non-Indian fee land is concerned, the Supreme Court has made clear, at the very least, that *exclusive* tribal jurisdiction is problematic, even though such land may well qualify as "Indian country."

**{33}** Following the U.S. Supreme Court's lead, as we must, we conclude that while the fee land at issue is "Indian country," consistent with our holding in *Romero*, the "Indian country" paradigm cannot, and does not, answer the narrow question here: whether the fee land can be considered part of the Pojoaque Pueblo solely for the purposes of the UCCJEA's "home-state" jurisdiction. The *Montana* cases strongly suggest that the fee land here cannot be so considered. In cases with substantially similar facts, the Supreme Court has essentially

---

[6]One recent U.S. Supreme Court case on Indian civil jurisdiction which addresses Section 1151 at some length is *Venetie*, 522 U.S. at 520-21. The Court in *Venetie* established the standard for determining whether Indian lands qualify as "Indian country" under Section 1151(b). We applied the *Venetie* standard in *Romero*, 2006-NMSC-039, to address how to treat fee land in a criminal context. However, the *Venetie* case is notably distinct from the other *Montana* cases in that it does not address Indian civil authority over non-Indian fee lands surrounded by tribal lands, and is therefore not especially helpful here. Rather, *Venetie* addressed whether approximately 1.8 million acres of land in northern Alaska qualified as "Indian country" under Section 1151(b), and concluded that it did not. 522 U.S. at 523, 532.

concluded that such fee land is not within tribal authority with respect to non-Indians. We note, and explain in detail below, that state jurisdiction here does not exclude tribal jurisdiction. Rather, comity allows and encourages both courts to exercise jurisdiction. In coming to our conclusion, we emphasize that we are determining the nature of this fee land only for UCCJEA purposes, and only on the facts of this case. Different facts might produce different results.

{34}    In sum, contrary to our Court of Appeals, we find no authority in federal Indian law or in recognized principles of tribal sovereignty that would give the Pojoaque Pueblo tribal court exclusive civil jurisdiction over this child-custody matter, such that it would displace concurrent jurisdiction with state courts. We next look to New Mexico statutory law—the UCCJEA—to see whether our Legislature has directed these parties to one forum or the other.

**Home State Status Under the UCCJEA**

{35}    The UCCJEA amounts to a decision by our Legislature to cede common-law jurisdiction over child-custody cases to courts in other states, where those courts have taken certain prescribed steps, under certain circumstances, to assert their own jurisdiction. Important to our controversy is that tribes are to be treated as states, meaning our Legislature has decided as a policy matter that it will surrender common-law custody jurisdiction to the tribes in the same way it would to Texas, Colorado, or Virginia. Thus, if the parties here had lived on the Pueblo for six straight months prior to filing the divorce action in state district court, that court would be required under UCCJEA "home-state" jurisdiction rules to surrender jurisdiction to the Pojoaque Pueblo tribal court. However, the UCCJEA remains silent about whether non-Indian land should be treated as tribal land for purposes of determining the territorial scope of any particular Pueblo. The Court of Appeals assumed that Section 1151 provided guidance, a conclusion which cannot be squared with recent U.S. Supreme Court case law. But Section 1151 cannot fill in the gap here for another reason: the Legislature never said it serves such a purpose within this particular statute. The Legislature easily could have done so, and has done so in other contexts.

{36}    We first observe that where Congress has desired to incorporate the Section 1151 "Indian country" definition into civil jurisdiction statutes, to specifically indicate that non-Indian fee land may qualify as Indian land, it has done so explicitly. *See Montana*, 450 U.S. at 562. ("If Congress had wished to extend tribal jurisdiction to lands owned by non-Indians, it could easily have done so by incorporating in [a federal trespassing statute] the definition of 'Indian country' in 18 U.S.C. § 1151 . . . ."). Many statutes and regulations explicitly apply Section 1151 to define Indian territory. *See, e.g., Hydro Res., Inc. v. EPA*, 562 F.3d 1249, 1258 (10th Cir. 2009) (noting that 40 C.F.R. § 144.3, a portion of an underground water protection regulation, defines "Indian lands" as "Indian country as defined in 18 U.S.C. § 1151" (internal quotation marks and citation omitted)). The most telling example for present purposes is the Indian Child Welfare Act, which explicitly defines "reservation" as "Indian country as defined in section 1151 . . . ." 25 U.S.C. §

11

1903(10) (2000).

{37}     Like Congress, our Legislature has also used the term "Indian country" to define the scope of Indian lands. *See, e.g.*, NMSA 1978, § 27-2B-6(F)(2) (2007) (incorporating federal Social Security Act definition of "Indian country" for purposes of New Mexico Works Act); NMSA 1978, § 6-28-4(A) (2006) (Indian Capital Outlay); NMSA 1978, § 11-13-1 (1997, as amended) (incorporating "Indian country" for criminal jurisdiction for purposes of Indian Gaming Compact, 2007 Joint Resolution).  It is clear that where Congress or our Legislature wishes to use the "Indian country" paradigm, they do so.  Using common-law canons of statutory construction, we may conclude that where the Legislature did not include such a definition, it intended to exclude it.  *See Boudette v. Barnette*, 923 754, 757 (9th Cir. 1991) ("[W]hen a statute designates certain . . . manners of operation, all omissions should be understood as exclusions.").  In our inquiry into how to classify the fee land here, the absence of any mention of Section 1151 or "Indian country" from the UCCJEA may not be dispositive, but it is persuasive evidence that the fee land at issue here cannot be considered part of the "home state" of the Pojoaque Pueblo within the meaning of the statute.

**History of the Fee Land**

{38}     The history and nature of the fee land here further aids our inquiry into how this land should be classified for purposes of UCCJEA "home-state" jurisdiction. First, the record discloses that Wife's father pays property taxes to Santa Fe County.  It is axiomatic in Indian law that state taxation of Indian lands is limited.  *See Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995) ("'[A]bsent cession of jurisdiction or other federal statutes permitting it,' . . . a State is without power to tax reservation lands and reservation Indians." (quoting *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 258 (1992))).  The fact that Wife's father pays state property taxes offers insight then into the status of this land as non-Pueblo land.

{39}     Second, the land's history, which we summarize below, tells us that for many years, and for many purposes, it was considered neither Pueblo nor federal land, but rather private land subject to state taxation.  Although the record before us now is largely silent about the fee land's history, we are confident based on this Court's treatment of the same land in *Romero*, 2006-NMSC-039, as well as the Court of Appeals opinion, *State v. Romero*, 2004-NMCA-012, 135 N.M. 53, 84 P.3d 670, that it is one of many parcels of land which the Pueblos sold during the late 19th and early 20th centuries to some 3,000 non-Indians as a result of territorial supreme court rulings, and later U.S. Supreme Court rulings, which cleared the way for Pueblos to sell their lands.  *See, e.g., United States v. Joseph*, 94 U.S. 614, 618 (1876) ("[P]ueblo Indians, [unlike other tribes], hold their lands by a right superior to that of the United States.  Their title dates back to grants made by the government of Spain before the Mexican revolution . . . ."); *see also Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 243 (1985) (noting that the *Joseph* rule permitted the sale of parcels of formerly Pueblo land, all inside Pueblo boundaries, to some 3,000 non-Indians).

**{40}**     The U.S. Supreme Court's 1913 decision in *United States v. Sandoval*, 231 U.S. 28 (1913), cast some doubt on the title of all these non-Indian lands, "by suggesting that the Pueblos had been wrongfully dispossessed of their lands." *Mountain States Tel. & Tel. Co.*, 472 U.S. at 243.  Congress in 1924 passed the Pueblo Lands Act (PLA) in response to these concerns.  The PLA established the Pueblo Lands Board to settle issues of title to various lands within the boundaries of New Mexico's pueblos.  *See id.* at 244-45.  Under the Board's rules, "adverse possession by non-Indian claimants, coupled with the payment of taxes from 1889 to the date of enactment in 1924, or from 1902 to 1924 if possession was under color of title, sufficed to extinguish a Pueblo's title."  *Id.* at 244.

**{41}**     A decision by the Board to grant title of formerly Pueblo land to a non-Indian had "the effect of a deed of quitclaim as against the United States and said Indians." *An Act To quiet the title lands within Pueblo Indian land grants, and for other purposes*.  Pub. L. No. 253, 43 Stat. 637 (1924).  This extinguishment of Pueblo title is important in determining the nature of non-Indian fee land within the boundaries of a Pueblo.  Prior to the enactment of Section 1151 in 1948, "Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest . . . ." *Solem v. Bartlett*, 465 U.S. 463, 468 (1984).  Title, for many years, was considered synonymous with territorial sovereignty, and even today governmental authority has not been completely divorced from title.  Congressional passage of Section 1151 altered the direct connection between title and "Indian country" status, but title and civil adjudicatory authority have never been, and still are not, completely de-coupled from one another.  *See* Frickey, *supra*, at 1768-69 ("Sovereignty connotes authority over a region and the people within it.  Recent federal Indian law cases have shown a trend away from conceptualizing tribal sovereignty as including this traditional geographic component." (Footnote omitted.)).

**{42}**     Our Court of Appeals noted many of these same cases, and undertook a similar analysis, in its opinion in *Romero*, 2004-NMCA-012.  Although we reversed that opinion, see *Romero*, 2006-NMSC-039, we did not take issue with the historical accuracy of the Court of Appeals' account of Pueblo land title issues, the Pueblo Lands Board, or the PLA. We merely concluded that the PLA did not provide "substantial and compelling evidence of congressional intent to change Indian country status."  *Id.* ¶ 25.

**{43}**     We agree with that conclusion.  We do note, however, that in the context of today's opinion—a civil action—the PLA title determinations carry greater weight than in a criminal context, in part, because the concerns which accompany "checkerboarding" of title in a criminal context may not be as pivotal in a civil matter.  In *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 358 (1962), the Court noted that "Indian country" designation is necessary in an area where Indian and private fee land are intermingled, so as not to impose upon law enforcement of duty to "search tract books in order to determine whether criminal jurisdiction over each particular offense, even though committed within the reservation, is in the State or Federal Government."  In the criminal context, Section 1151's "Indian country" designation provides necessary homogenizing force, creating uniformity out of the sometimes chaotic jumble of land titles on, near, and

13

within tribal boundaries. This kind of homogenization is not essential in civil cases, where concerns about time-sensitive police responses are absent, and where cases unfold on a much longer time line, and it is possible and even desirable to consult maps and tract books to determine the nature of land ownership.

**{44}** The fee land in question here, as part of the body of land confirmed as private land by the Pueblo Lands Board, would have been subject to the foregoing legal principles about the extinguishment of Pueblo and federal title. We recognize that times, as well as the law, have changed for the better during the last 85 years, but we find it persuasive that the provenance of this fee land suggests it was understood, for many years, to be non-Pueblo land—not for criminal jurisdiction over tribal members as Congress and this Court have made clear—but in other contexts, and at least in the narrow set of civil jurisdiction circumstances outlined in the *Montana* line of cases.[7]

**{45}** In sum, the text of the UCCJEA, combined with the *Montana* cases and the history of the non-Pueblo fee lands and the PLA, compels a conclusion that the non-Indian fee land in this case cannot be considered part of the Pueblo under the UCCJEA and under these facts. This conclusion is in keeping with the U.S. Supreme Court's evolving notion of what constitutes tribal land for purposes of civil jurisdictional authority, which, as we have seen, is highly situation-dependent.

**{46}** As a sort of coda to our analysis, we note that our conclusion finds further support in the written opinion of the Pojoaque Pueblo court. In its "Final Decree of Child Custody, Support and Visitation," the court described Wife's removal of the children to her father's house as taking the children "off Pueblo lands," strongly suggesting that the Pueblo itself, or at least the Pueblo court, does not consider the fee land to be Indian territory. The court reiterated this position two paragraphs later, describing Wife's removal to her father's property as taking the children "off tribal lands." Further, the court asserted jurisdiction over

---

[7]Judge Sutin, dissenting from the Court of Appeals opinion in *Romero*, mounted a crisp and persuasive argument against that Court's conclusion that the PLA's treatment of non-Indian lands was dispositive of tribal criminal jurisdiction on those lands. 2004-NMCA-012, ¶¶ 39-42. Judge Sutin later noted, in a similar vein, that disputes about what portions of Section 1151 may or may not apply to Pueblos, as well as the larger dispute over jurisdiction on Pueblo lands, are questions that cry out for a "political, not a judicial solution," because "[t]he legal backdrop is quaggy and unstable. What exists is a hodgepodge of cases involving a patchwork of statutes, and a mishmash of analyses, stated purposes, arguments, and results, providing . . . no common direction for the right result in this case." *Id.* ¶ 55. We agree. Having delved deeply into the "quaggy" realm of state-tribal jurisdiction, we appreciate Judge Sutin's observations, but, we nonetheless conclude that the PLA does provide a good backdrop against which to make our decision, which is rooted in a legal foundation that, while lamentably "unstable," is not so formless that it prevents us from discerning patterns sufficient enough to guide us to a sound and principled conclusion.

the child-custody, support, and visitation matters "based on the parties' significant connections to this forum." While the court did not cite to either the PKPA or the UCCJEA in its decree, and we therefore cannot be certain that it intentionally adopted the language of those statutes, it appears that the court may have been conceding that it did not have "home-state" jurisdiction, but rather relied on "significant connections" jurisdiction, as does the state court.

## *Williams v. Lee* **Infringement**

{47}    Repeatedly, we have recognized the "infringement test" developed from *Williams v. Lee*, 358 U.S. 217, 220 (1959), which upheld "the right of reservation Indians to make their own laws and be ruled by them." *Found. Reserve Ins. Co. v. Garcia*, 105 N.M. 514, 515, 734 P.2d 754, 755 (1987). Although the U.S. Supreme Court in the *Montana* line of cases subsequently narrowed *Williams*, particularly where the issue is tribal authority over non-Indians, we continue to apply the infringement test to determine whether the exercise of state authority will compromise the tribal sovereignty recognized in *Williams*. Under the infringement test, we consider three factors: whether the parties are Indian or non-Indian; whether the cause of action arose within the Indian reservation; and the nature of the interest to be protected. *Found. Reserve Ins. Co.*, 105 N.M. at 515, 734 P.2d at 755. This case involves a non-Indian mother residing on non-Indian fee land within the Pueblo of Pojoaque, thereby affording both the State and the Pueblo considerable interests in adjudicating child-custody matters involving New Mexico citizens and Pojoaque tribal members. Therefore, the exercise of concurrent (but not exclusive) state-court jurisdiction on these facts does not infringe on the Pueblo's ability to make its own laws and be governed by them.

## *Tempest Recovery Servs., Inc. v. Belone*

{48}    In reaching its conclusion that the tribal court had exclusive jurisdiction over the child-custody issue, the Court of Appeals relied on this Court's opinion in *Belone*, 2003-NMSC-019, ¶¶ 10-12, for the proposition that Section 1151's definition of "Indian Country" applies "in civil cases." *Garcia*, 2008-NMCA-116, ¶ 21. In part due to some of the collateral language therein, *Belone* may have been misapprehended.

{49}    In *Belone*, we concluded that a Navajo tribal court and a New Mexico district court shared concurrent jurisdiction over an auto repossession action, where the automobile was repossessed from an Indian allotment outside the boundaries of the Navajo reservation. 2003-NMSC-019, ¶ 15. In addition to reaffirming the *Belone* Court's emphasis on concurrent state-tribal jurisdiction in civil cases, we note that the opinion's express holding is only that "allotted Indian lands . . . [are] Indian country pursuant to § 1151." *Id*. ¶ 12. This uncontroversial proposition is fully supported by the text of Section 1151(c), which grants "Indian country" status to "all Indian allotments, the Indian titles to which have not been extinguished . . . ." In the course of observing that Section 1151 has been applied beyond the criminal context for which the statute was originally intended, the *Belone* Court made some broad statements about its application to civil cases. Those statements should

15

not be taken to mean that Section 1151 necessarily applies in all civil matters. To the extent the Court of Appeals may have done so, it read more into *Belone* than we intended.

**Parental Kidnapping Prevention Act**

{50}    In analyzing the applicability of the PKPA to the present case, we first note a fundamental difference between the federal statute and the UCCJEA. While the UCCJEA is a state enactment which is not binding on tribal courts, the PKPA would apply to tribes if Congress intended it to do so, because of Congress's plenary power over the tribes. *See S.D. v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights."). If the PKPA were to define tribes as "states," then, unlike the UCCJEA, the PKPA would require the tribes to abide by its conditions, even if the tribe did not explicitly pass such a statute. *But see* Canby, *supra*, at 228-29 ("Neither the Constitution nor federal statutes appear to require tribal courts to give full faith and credit to state court judgments. As a matter of practice, however, many tribal courts regularly give full effect to state court judgments, presumably also as a matter of 'comity.'").[8] We, therefore, turn to an analysis of whether the PKPA applies to tribes.

**Application to the Present Case**

{51}    The PKPA applies virtually the same analytical framework as the UCCJEA. It sets up the same two-tiered analysis for determining jurisdictional priorities in child-custody cases. *See* § 1738A(c)(1) and (2). There is, however, one distinction between the UCCJEA and the PKPA which is significant here. Unlike the UCCJEA, the PKPA does not explicitly define Indian tribes as "states" for purposes of interstate full faith and credit. If the PKPA does not treat tribes as "states," then the conclusions of tribal courts need not be given full faith and credit by state courts. The converse is also true. If tribes are not "states," then they have no duty under the PKPA to give full faith and credit to state-court judgments. For reasons described in the following section, we determine that the PKPA does not apply to tribes, and therefore, has no application in this case. Neither the district court nor the tribal court were required to give one another full faith and credit under the terms of the PKPA.

{52}    Courts are divided over whether the PKPA and similar full faith and credit legislation intend to treat Indian tribes the same as "states." Some jurisdictions have held that tribes should be treated as "states" under the PKPA and similar statutes. *See In re Larch*, 872 F.2d 66, 68 (4th Cir. 1989) (holding that the Cherokee tribe is a "state" for purposes of the PKPA); *Martinez v. Superior Court*, 731 P.2d 1244, 1247 (Ariz. Ct. App. 1987) (holding that

---

[8]The Violence Against Women Act, 18 U.S.C. §§ 2265-2266 (2000), contains a full faith and credit provision which mandates that all states, tribes, and territories enforce one another's orders of protection. In New Mexico, the Tribal-State Judicial Consortium has adopted a standard front page for protection orders that will aid the enforcement of protection orders across jurisdictions.

Indian reservations are "territories or possessions," and, therefore, to be treated as "states" for purposes of Arizona's UCCJA). At least one tribal court has specifically held that the PKPA requires tribal courts to afford full faith and credit to state-court judgments. *See Eberhard v. Eberhard*, 24 Indian L. Rptr. 6059, 6060 (Cheyenne River Sioux Tribal Ct. App. 1997). Other courts have concluded that tribes should not be treated as "states" for the purpose of full faith and credit in a child-custody context. *See, e.g., John v. Baker*, 982 P.2d 738, 762 (Alaska 1999) (concluding that "the PKPA does not accord full faith and credit to tribal judgments"); *Desjarlait v. Desjarlait*, 379 N.W.2d 139, 144 (Minn. Ct. App. 1985) (determining that Minnesota's UCCJA does not apply to jurisdictional disputes between state courts and tribal courts, and that the federal constitution's full faith and credit clause "expressly applies to matters between states, not to matters between tribal courts and states"); *Malaterre v. Malaterre*, 293 N.W.2d 139, 144 (N.D. 1980) (refusing to resolve a child-custody issue between a tribal court and a state court on the basis of the UCCJA, because the UCCJA "pertains to fact situations which involve jurisdictional disputes with sister states"). We find more persuasive the position that the PKPA does not apply to tribes, and therefore, tribes are not bound to give full faith and credit, under the PKPA, to state-court judgments in state-court cases.

**{53}** In evaluating the PKPA, as with any statute, we first look to the plain text, and if we discern ambiguity there, we then engage in the act of statutory interpretation. *See State ex rel. Helman v. Gallegos*, 117 N.M. 346, 352, 871 P.2d 1352, 1358 (1994). The PKPA nowhere states that tribes are to be treated as states, and in fact, the words "tribe" and "Indian" are entirely absent. Observers have noted that the PKPA's legislative history lacks any suggestion that Congress intended the statute to apply to tribes. *See* Barbara Ann Atwood, *Fighting Over Indian Children: The Uses and Abuses of Jurisdictional Ambiguity,* 36 UCLA L. Rev. 1051, 1063 n.50 (1989) (noting that "the legislative history of the PKPA contains no discussion of tribal custody decrees," and that "Congress was manifestly concerned with reducing jurisdictional competition between state courts"). The absence of any mention of tribes or Indians might be taken to signify that Congress simply assumed that the statute would apply to tribes—that tribes are understood to be treated like states for the purposes of affording full faith and credit to judicial decisions. This is one of the primary arguments made by those who believe the PKPA was meant to apply to tribes. *See Eberhard*, 24 Indian L. Rptr. at 6065 (noting that, in the context of the legislative development of the PKPA, "Congress was not required to explicitly refer to Indian tribes since the judicial interpretive backdrop against which it legislated . . . clearly reflected that tribes were included within the states, territories, or possessions of the United States"). One of the judges on the *Eberhard* panel, Robert N. Clinton, also a law professor at Arizona State University, has articulated this view elsewhere. *See* Robert N. Clinton, *Tribal Courts and the Federal Union,* 26 Willamette L. Rev. 841, 902-04 (1990).

**{54}** The argument that Congress implicitly intended the PKPA to be applied to tribes, as a matter of background principles, would be stronger if not for the multiple statutes very similar to the PKPA which, on their plain terms, apply to the tribes. *See* 25 U.S.C. § 1725(g) (judicial proceedings of the Passamaquoddy Tribe, Penobscot Nation, and State of Maine);

17

§ 1738(B) (child support orders); 18 U.S.C. § 2265(a) (2000) (Violence Against Women Act); 25 U.S.C. § 1911(d) (2000) (Indian Child Welfare Act). The explicit inclusion of tribes in these statutes strongly suggests that Congress not only considers it necessary to specify when legislation is meant to apply to tribes, but also that Congress is capable of doing so when it desires. The most telling example is Section 1738(B), which immediately follows the PKPA in the United States Code. Section 1738(B) mandates full faith and credit between "states" for child-support orders, and it defines "state" as "a state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the territories and possessions of the United States, *and Indian country (as defined in section 1151 of title 18*)." 28 U.S.C. § 1738(B) (emphasis added). The PKPA employs a virtually identical definition of "state," except that it does not include the phrase "and Indian country."

**{55}** We also observe the fundamental principle of Indian law that tribes retain "all inherent attributes of sovereignty that have not been divested by the Federal Government," and that "the proper inference from silence . . . is that the sovereign power . . . remains intact." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148-49 n.14 (1982). Applied here, this principle strongly suggests that if Congress intends to dictate to tribal courts principles of full faith and credit, it must do so explicitly.

**"Territories" as Used in the PKPA Does Not Refer to Tribes**

**{56}** Another argument sometimes made for applying the PKPA and other full faith and credit measures to the tribes is that the word "territories" in the Act is meant to refer to tribes. See *Eberhard*, 24 Indian L. Rptr. at 6059; *Sheppard v. Sheppard*, 655 P.2d 895, 902 (Idaho 1982). Similarly, a series of 19th century opinions by the Eighth Circuit held that Indian tribes were territories under the then-existing full faith and credit statute. *See Cornells v. Shannon*, 63 F. 305, 306 (8th Cir. 1894); *Standley v. Roberts*, 59 F. 836, 845 (8th Cir. 1894); *Mehlin v. Ice*, 56 F. 12, 19 (8th Cir. 1893). Not all observers agree that these Eighth Circuit cases definitively hold that tribes are "territories." *See* Kelly Stoner & Richard A. Orona, *Full Faith and Credit, Comity, or Federal Mandate? A Path That Leads to Recognition and Enforcement of Tribal Court Orders, Tribal Protection Orders, and Tribal Child Custody Orders*, 34 N.M. L. Rev. 381, 385 (2004) ("[I]n closely examining the opinions of the [Eighth Circuit], it is quite clear that none have ever conclusively determined that tribes are indeed 'Territories'. . . ."). Others question that there is any relationship between the 19th century opinions of the Eighth Circuit and the present day full faith and credit statute. *See* Fred L. Ragsdale, Jr., *Problems in the Application of Full Faith and Credit for Indian Tribes,* 7 N.M. L. Rev. 133, 139 (1977) ("[T]he relationship between the [8th Circuit] cases and full faith and credit legislation . . . is tenuous at best.").

**{57}** The Eighth Circuit's 19th century views notwithstanding, the view of tribes as "territories" for the purposes of full faith and credit statutes appears to have fallen out of favor with most contemporary courts. *See* Canby, *supra*, at 228 ("Despite some argument over the matter, it is probable that tribal court judgments do not fall within [the "territory"] terminology [of the general full faith and credit statute]."); Atwood, *supra*, at 1063 n.50

(noting that "most courts have concluded that Indian tribes are not 'territories or possessions' of the United States and therefore are not bound by the full faith and credit guarantee"); Stephanie Moser Goins, *Comment: Beware the Ides of Marchington: The Erie Doctrine's Effect on Recognition and Enforcement of Tribal Court Judgments in Federal and State Court*, 32 Am. Indian L. Rev. 189, 207 (2007) (observing that modern courts have "rejected the 19th century view of tribes as entities under the ownership of the United States," and that the "prevailing modern view among courts is that tribes are not properly considered 'territories' or 'possessions' within the meaning of 28 U.S.C. § 1738"); *see also Brown v. Babbitt Ford, Inc.*, 571 P.2d 689, 694 (Ariz. Ct. App. 1977) (stating that "territory" does not refer to tribes); *but see Sheppard*, 655 P.2d at 902 (stating that "territories and possessions" includes Indian tribes); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65 n.21 (1978) (noting in dicta that tribal court judgments "have been regarded in some circumstances as entitled to full faith and credit in other courts"); *Tracy v. Superior Court of Maricopa County*, 810 P.2d 1030, 1038 (Ariz. 1991) (same).

**{58}**    Furthermore, we note that reading "territories" to mean "tribes" would render superfluous the explicit inclusion of "Indian tribes" in Section 1738(b) and other statutes that on their terms apply to "territories" and also to "tribes." This Court has in the past noted that we will not interpret statutes so that terms are rendered mere surplusage. *See State v. Javier M.*, 2001-NMSC-030, ¶ 32, 131 N.M. 1, 33 P.3d 1 ("'A statute must be construed so that no part of the statute is rendered surplusage or superfluous.'" (quoting *Katz v. N.M. Dep't of Human Servs.*, 95 N.M. 530, 534, 624 P.2d 39, 43 (1981)). This statutory interpretation canon, while not dispositive by itself, provides further persuasive evidence that when Congress intends to apply full faith and credit principles to tribal courts, it does so explicitly.

### *Jim v . CIT Fin. Servs. Corp.*

**{59}**    One case often cited for the proposition that Indian tribes qualify as "territories" for the purposes of full faith and credit is *Jim v. CIT Fin. Services Corp.*, 87 N.M. 362, 533 P.2d 751 (1975). There, this Court held that under the general full faith and credit statute, 28 U.S.C. § 1738, the laws of the Navajo Nation were entitled to full faith and credit in New Mexico courts. With virtually no discussion, this Court concluded that the federal statute applied "because the Navajo Nation is a 'territory' within the meaning of that statute." *Jim*, 87 N.M. at 363, 533 P.2d at 752. *Jim* is a brief opinion which offers little explanation in support of its holding, which was at the time, and continues to be, controversial. The opinion is easily distinguished from the present case, in part because it interprets Congress's general full faith and credit statute, not the PKPA, and is therefore not directly applicable here. Furthermore, the opinion's failure to acknowledge the considerable debate, which has only grown since 1975, about whether "territory" means "tribe" weakens its conclusion. We need not overrule *Jim*, because it does not apply directly to the statute at issue, but we do note that its conclusion, and attendant dearth of reasoning, has become highly suspect in

19

light of the subsequent development of case law over the last 35 years.[9]

**{60}** In sum, we are persuaded by the growing chorus of cases holding that tribes are not "states" for full faith and credit purposes unless Congress explicitly designates them as such, and that tribes are not "territories or possessions" within the meaning of the PKPA. As a result, in the absence of further congressional action in this area, New Mexico is not bound to defer to tribal courts under the terms of the PKPA, and tribal courts are likewise not bound to defer to New Mexico courts. The PKPA simply does not apply here. For this reason, we do not need to address Wife's argument that the PKPA preempts the UCCJEA.

**{61}** The conclusion that the PKPA does not apply here does not alter our result. Because the UCCJEA clearly applies to the New Mexico court, and the New Mexico court clearly has "significant connections" jurisdiction, we hold that the district court properly exercised jurisdiction over the child-custody matter in this case.

**Tribal-State Comity**

**{62}** Where does this leave the question of tribal jurisdiction? We are unable, in the absence of congressional guidance, to make any final determination as to that issue. It is not for us as a state court to say whether the Pojoaque Pueblo, subject to the plenary power of Congress, has jurisdiction. We do note, however, the strong congressional expression in favor of tribal self-determination as to the upbringing of tribal children—a policy that is particularly important here, where both children are enrolled members of the Pojoaque Pueblo. *See* 25 U.S.C. § 1901(3) ("[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children."); *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 37 (1989) (observing that the Indian Child Welfare Act "seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society" (internal quotation marks and citation omitted)).

**{63}** For purposes of resolving the case before us, the district court on remand should assume that the tribal court has jurisdiction, as we hope and assume that the tribal court will treat the district court's exercise of jurisdiction as proper. In short, the courts should treat tribal and state-court jurisdiction over this child-custody matter as concurrent—a concept that is not unfamiliar in New Mexico law. *See State Sec., Inc. v. Anderson*, 84 N.M. 629,

---

[9]At least one New Mexico opinion, by the Court of Appeals, has directly cited *Jim* for the proposition that the Navajo Nation code is entitled to full faith and credit under 28 U.S.C. § 1738 because the Navajo Nation is a "territory" within meaning of the statute. *Halwood v. Cowboy Auto Sales, Inc.*, 1997-NMCA-098, ¶ 9, 124 N.M. 77, 946 P.2d 1088. A special concurrence in that case expressed concern over the "dubious authority credited to" the *Jim* case, and correctly noted that "[s]cholarly commentary places [*Jim*'s conclusion about full faith and credit] in doubt"—an observation we reiterate and emphasize today. *Id.* ¶ 28.

632, 506 P.2d 786, 789 (1973) ("State jurisdiction does not eliminate Indian jurisdiction, it exists concurrently with it."); *Wacondo v. Concha*, 117 N.M. 530, 534, 873 P.2d 276, 280 (Ct. App. 1994) (holding that concurrent state-tribal jurisdiction over torts committed within a Pueblo by a member of another Pueblo is not preempted by federal law). Other states have also recognized concurrent state-tribal jurisdiction involving child-custody disputes where at least one of the parties does not reside on reservation land. *See John*, 982 P.2d at 759; *In re Marriage of Skillen*, 956 P.2d 1, 18 (Mont. 1998).

**{64}**     We acknowledge that concurrent jurisdiction runs counter to the purpose of both the UCCJEA and the PKPA, but for the reasons explained above, neither of those statutes can bind the tribal court in this case to give full faith and credit to the state court's exercise of jurisdiction. We also recognize that concurrent jurisdiction could potentially result in conflicting orders emanating from tribal and state courts. This does not mean, however, that the tribes and the state cannot defer to one another. Quite to the contrary, we have always encouraged tribal courts and state courts to liberally apply principles of comity so as to avoid unnecessarily conflicting judgments and to promote efficiency and justice. New Mexico recognizes the following broad principles of the doctrine of comity:

> [S]tate courts recognize foreign judgments where the proceedings on which the judgment is based are not contrary to the public policy of the forum, where the judgment sought to be recognized was rendered under circumstances wherein the foreign court had jurisdiction over the subject matter and the parties, and where the parties were given an opportunity for a full and fair hearing on the issues.

*Watson v. Blakely*, 106 N.M. 687, 690, 748 P.2d 984, 987 (Ct. App. 1987), *overruled on other grounds by Kelly Inn No. 102, Inc. v. Kapnison*, 113 N.M. 231, 239, 824 P.2d 1033, 1041 (1992).

**{65}**     Our state has a long and laudable tradition of comity between state and tribal courts, particularly where the upbringing and well-being of children are concerned. We are aware of state and tribal courts which routinely sit in joint sessions in our state, particularly on child-custody issues, and we generally encourage the spirit behind this practice. This tradition can survive only where courts actively strive to reach common ground. Our state's Tribal-State Judicial Consortium was formed in 1997 with precisely these goals in mind.[10] We recognize the strong interests of both tribal and state courts in adjudicating custody disputes, but we also recognize that clashes between courts can do much more harm than good to the well-being of the children involved.

**{66}**     Comity "is neither a matter of absolute obligation, on the one hand, nor of mere

---

[10]Two members of this Court, Justices Serna and Maes, have served at different times for many years on the Consortium.

courtesy and good will, upon the other." *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895). Other jurisdictions have recognized that comity provides the "best general analytical framework for recognizing tribal judgments." *Wilson v. Marchington*, 127 F.3d 805, 810 (9th Cir. 1997); *see Fredericks v. Eide-Kirschmann Ford, Mercury, Lincoln, Inc.*, 462 N.W.2d 164, 167-68 (N.D. 1990); *Mexican v. Circle Bear*, 370 N.W.2d 737, 741 (S.D. 1985). In addition, the UCCJEA itself facilitates communication between courts for purposes of child-custody determinations. *See* § 40-10A-110 (stating that a New Mexico court "may communicate with a court in another state concerning a proceeding arising under" the UCCJEA); § 40-10A-112 (outlining processes for cooperation between courts). We instruct the district court to apply these principles on remand.

**{67}** We suspect that in the end there may be no conflict of substance between the courts. However, as a cautionary note, we emphasize that the interests of comity do not outweigh the district court's independent obligation to consider the child's best interests in coming to a custody determination. *See* NMSA 1978, § 40-4-9(a) (1977) (providing that the district court must "determine custody in accordance with the best interests of the child"). If the two courts cannot reach consensus, the district court has its own duty to perform; it must adjudicate the dispute.

**CONCLUSION**

**{68}** We reverse the Court of Appeals and remand to the district court for further proceedings consistent with this opinion.

**{69}** **IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**CHARLES W. DANIELS, Justice**

**Topic Index** *Garcia v. Gutierrez*, **No. 31,263**

| | |
|---|---|
| **CD** | **Children** |
| CD-CS | Custody |
| **CP** | **Civil Procedure** |
| CP-FF | Full Faith and Credit |
| **CT** | **Constitutional Law** |
| CT-FF | Full Faith and Credit |
| **DR** | **Domestic Relations** |
| DR-CD | Child Custody |
| DR-PA | Parental Kidnapping |
| DR-PR | Parental Rights |
| DR-UC | Uniform Child Custody Jurisdiction |
| **IL** | **Indian Law** |
| IL-TC | Tribal Court Jurisdiction |
| IL-TJ | Tribal and State Authority and Jurisdiction |
| IL-IL | Indian Lands |
| **ST** | **Statutes** |
| ST-RC | Rules of Construction |